Thank you. May it please the Court, the issue that both of these cases present is whether there is sufficient evidence to survive summary judgment on the issue of retaliatory intent, and in particular in this case, whether there is enough evidence to establish for the jury to find that the employer's reasons for terminating both of these employees was pretextual. And I want to state at the outset, Your Honors, that summary judgment is just not appropriate in a case like this, where you have not only evidence that the timing of the terminations in both cases was suspicious, but when you take that and you look at the things that were said to the employees before they were terminated, the things that were said afterwards, and then the innumerable factual disputes, including questions of credibility, that are raised by the employer's ever-increasing reasons for terminating them. I'd like to turn first, if I may, to Linda Stegall's case. These cases are somewhat similar, but there are factual differences. The Marathon Media took over five radio stations in Pasco, Washington, including the one where both Ms. Stegall and Ms. Kroom worked, and that was effective November 9th of 1999. Both of these employees, Ms. Stegall and Ms. Kroom, were then fired on December 15th of 1999, so all of this happened with respect to Marathon Media in a very short period of time. After Eric Van Winkle is appointed as general manager of the station for Marathon, and this is sometime in November, the dates are a little unclear as to Ms. Stegall's, the timing on this, Eric Van Winkle calls her in and asks her if she would help him find a new program director for KORD, and that he wants her help in doing that. She then goes on a short vacation and appears to come back sometime probably after the Thanksgiving holidays and learns that there have been put in place two new program directors without her assistance, and that's Paul Drake and Kurt Cartier. Now, what's interesting is then Ms. Stegall has another conversation at this time, and this is now late November, with Eric Van Winkle, and he assures her her job is secure, very secure are the words he uses, and in fact he describes that you are KORD. Ms. Stegall has worked for years there as their radio morning talk show host. She also goes to Paul Drake at that time and talks with him, and he also tells her that her job is secure, and this again is in late November of 1999. Now, then in early December of 1999, and we don't have the exact date, but it's approximately that first week in December, Ms. Stegall has a conversation with Mr. Drake, who is now her supervisor, and she tells him about this history she has of dealing with discrimination at the radio station. She gave him a background of what had happened. Those are the words that she uses in her testimony. She told him how she had been discriminated on the basis of because she was a woman in the past, and she told him, you know, my pay is still not the same as my male co-host, and she told him she expected him to do something about that. In other words, she made a complaint that she was not being treated fairly because of her gender. Now, that's in early December, and then she's fired on, you know, less than two weeks later. But add to that her relationship with the other program director, Kirk Cartier. Back, and this goes back almost over a year ago, in October of 1998, Ms. Stegall had a great deal of difficulty with the management at that time about her pay. She was paid substantially less than the male co-hosts that worked on the show with her. She had a number of complaints, and they're set out in the brief, and I won't take up my time with those this morning. But all that's before Marathon got there. It is. What does that have to do with what Marathon did? It's important in this respect because in October of 1998, she takes a strong stand against this discrimination. She walks out for two weeks. She contacts the president or vice president of the company. Before Marathon has acquired KOR. It is. But what's important is. My question is, explain to me why that has bearing on what Marathon did. Because she tells Kirk Cartier about it at that time. And she has a pretty good relationship with Kirk Cartier up to that point. They're friendly with each other. There's some evidence there was some jealousy. He had some minor complaints about she played the music too loud and that sort of thing. But after she takes the stand of discrimination, he hates her is the testimony after that time. And it's because she made complaints of discrimination and because she walked out and took that stance. There's testimony from an independent witness, Tammy Peterson, who was a salesperson there. But this is what Cartier told her. He was very angry that Linda Stiegel had taken a stand against discrimination and she had walked out. He also Linda tries to make the decision after Marathon. He was one of the three decision. My question is, did he make the decision? Yes, he was one of the three. Explain who made the decision for Marathon. Explain who did that. On the record. What does it show about how they made their decision? For Marathon's evidence, the three of them talked and decided. I went through the employees and decided whether they were going to keep Miss Stiegel in this crew. Mr. Cartier, it's interesting, denies at first that he had anything to do with the decision with Miss Stiegel. But Paul Drake testifies that Kirk Cartier was adamant that she and Miss Kroon be fired. Those are the words that Paul Drake uses in his testimony. He was adamant. This was clearly a decision made by both Paul Drake and Kirk Cartier with the imprimatur of the general manager, Eric Van Winkle. Wouldn't it be the general manager's decision in that corporate structure? You would think the general manager testified that he left this largely up to Paul Drake and Kirk Cartier, that he tried to distance himself a little bit from what happened here. And that was his testimony, that they made the decision. And Kirk Cartier, in the end, in his deposition, didn't dispute that. And Paul Drake testified Kirk was the one that was adamant that Linda be terminated. And that's the significance of the earlier incident of complaining of discrimination to Citadel, was the owner at the time, is that Kirk Cartier learned of her complaints of discrimination. And his anger towards her persisted all the way up through the November of 99 when Marathon Media took over. And then he was in a position to do something about how he felt. Just within a couple of months before Marathon took over, Kirk Cartier had said to Ms. Croom something to the effect that Linda Stiegel, he hoped she'd be fired. The words were cruder than that, but that's what he conveyed when Marathon Media came in. Now, he may not have known he was going to be in a position of power at that time, but that was certainly his belief and his feeling towards her. And as soon as he had the opportunity to do so, he assisted in firing her. What percentage of the announcers for K.O.R.D. were terminated by Marathon after its acquisition? There were only two, and that was Linda Stiegel and Kristen Croom. Now, this has been a contention with Marathon. I thought the district court said that there was a general house cleaning and that all of the full-time announcers, the daily announcers, were terminated. No. The district court did say that. Did the district court say that? The district court said they were all replaced. Okay. But here's what the record shows. Linda Stiegel and Kristen Croom were the only ones that were fired. That was admitted on the summary judgment argument by Marathon's attorney. It's the only thing we have in the record, that they were actually terminated. Now, they have pointed to other employees who were reassigned at that time, but they didn't lose their jobs. Well, still, as I understand it, the point on which your argument is hinged is to say that when Marathon says we were cleaning house or reorganizing after an acquisition, putting our own personality there, we were changing everybody, that your client's position is that's pretextual, and your evidence raises a genuine issue of fact on pretext. Isn't that kind of at the heart of it? That's not the entire heart of it. That's only a small part of it. Okay. Well, I guess what I was getting to, and then you can explain to me what I'm missing, is that if Marathon says we were cleaning house or reorganizing, we're putting our own stamp on this station after we acquire it, then it's consistent with that whether they reassign people or fire them. You know, in other words, they're changing the lineup on the air. And if they can find another place for someone, fine. But if they don't, then they terminate them. So I don't see what raises an issue of pretext here when they've on a wholesale basis gotten rid of everybody who was an announcer. Here's why that is pretextual. First of all, everybody wasn't gotten rid of. They were reassigned. They took them off the air then. Their position is that Ms. Stiegel refused to move to another shift, and that was one of the reasons that she was fired. Her evidence, though, is she was never asked to move to another shift. That's one reason why it shows a textual. The other reason is Marathon has pointed to several people to say, well, look, these people all were gone from the company, and so that shows we were changing things. But if you look at the people they point to, they weren't gone. They point to a man named Gary Mitchell, who was an announcer. He didn't leave the company or wasn't fired for a year and a half after they took over. That was not an example of cleaning house or changing things. That raises an issue as was he a daily announcer. He was a night announcer, I believe, at that time. Was he on every day like Monday to Friday? I don't know that. Because what the district court said was that all of the people who were on daily were replaced. They were reassigned, except for these two. I don't disagree with that. But one of them was her co-host, Ed Daly, at the time, and he continued to do a Sunday morning show that he had done previously. Right, but that's a one-day-a-week thing and not a full-time thing. Yes. The other announcer that was with her. He did the all-day show on the weekend, right? That's right, on Sunday mornings. The other announcer that worked with her, his nickname was Hootie. I think Pat Harvey was his real name. He was actually, they claimed that he was fired or that he left the company, and that's just not true. The promotions director submitted an affidavit that he was actually doing voice tracks at another station, and then after several months he was brought back and reassigned and put back on the morning show within a short time after Ms. Stegall was fired. I don't dispute that the other announcers, and there's only two or three others, were then reassigned. The problem I'm having is seeing where these kinds of minor differences, like someone was tossed out but then they hired him back later. I don't see how that shows pretext. To me it just shows like an acquiring company that's trying to reorganize and get its team straight, and so it makes this or that adjustment, and by hook or by crook it clears the decks and starts to reassign people, and it normally wouldn't terminate someone until they had a replacement. They can't go on the air and say, we have no show today. So they can't terminate someone until they have a replacement lined up. But they did terminate Ms. Stegall without a replacement lined up, and then they eventually reassigned some of the hosts. But who was on the air then? They had someone to go on the air. Her co-hosts who had been working with her. Well, that's what I mean. Your Honor, my point in bringing up these kinds of changes is that they've been exaggerated. Not only did they say people were fired when they weren't, but they also said, for example, Scott Serrata and Tim Cotter who preceded Eric Van Winkle and Kurt Cartier and Paul Drake were part of these changes. Well, they couldn't have been because they left before Kurt Cartier, Paul Drake, and Eric Van Winkle tried to make these changes. And it's not just the changes in personnel that we're relying on. There's a whole host of things that Marathon has said as reasons that either don't make sense or are just not true. The other aspect of their changes was they said they made formatting and programming changes. A formatting change in radio means you change the music that's played. The music that's played there has always been country music. That was never changed. And there's evidence in the record. Didn't they change, though, the, you know, like, I mean, there's subdivisions in country music. I thought they changed like whether they were stressing old time country favorites or or new, you know, the newer groups. That's not a formatting change. And that would be something that's commonly done. But the promotion structure and Linda Siegel, who also have a lot of experience in radio, testified that these kinds of changes were pretty routine. We changed the clock. You change the liners, which are the announcements that are made. You emphasize one kind of music or another. I mean, I think a jury should have the right to consider whether they really were making these dramatic changes that they've described or whether that was just part of a pretext to get rid of Linda and and and Kristen. But it's more than just the excuse they've given of programming and formatting changes. After both Linda and Kristen were terminated, they told first of all, they told Linda in her termination meeting, you know, she asked, did I do something wrong? Is there something wrong I've done? And she they say no. Then before the unemployment hearing, they didn't just say, you know, no, we're not giving evidence. They actually said nothing. They did cause their dismissal. And they had the opportunity at that point to say whether there was any misconduct. And certainly my experience has been employers rush right down and list everything they can think of to try to win those unemployment hearings. That didn't happen in this case. Then after the litigation starts, and this is really the crux of our pretext argument, Your Honor, is that they came up with a list of reasons why they said they fired her. And if I will go through them, there is evidence refuting that they are just not true, or at least a jury should be able to weigh whether that was really a reason that they fired her. And starting with Miss Stiegel, for example, and I've already mentioned this, Eric Bidwinkle testified, well, she refused to move to another time slot. She was never asked to move and she would have been happy to move. That's the evidence in the record. He said that she refused to do remotes, which are things that you do, you know, appearances outside the radio station. And she never refused to do a single remote. In fact, she had a reputation for being good at remotes. That's what came from Kurt Cartier, something she was paid for. She would never refuse to do that. Bidwinkle said another reason he wanted to fire her is she told him that there was nothing she could do to improve her job when he took over. And he didn't like that attitude. That never happened. There's evidence in the record that that never happened. And if none of these things happened and they're coming into court and saying, well, we're firing her because of her bad attitude, but the incidents they're relying on didn't happen, surely a jury should be able to weigh the evidence, not the court, but the jury, to weigh whether that, in fact, was the real reason. And you couple that with the exaggeration of the formatting changes, and I think these present questions of fact. My time is coming to an end. Can you reserve some time? Yeah, I would. Okay. Thank you, Your Honor. Thank you very much for your argument so far. Now we'll hear from Courtney. And you pronounce it Wislaw? Wislaw, yes. Yes. Courtney Wislaw. Thanks. Good morning, Your Honors. May I please get the court, Courtney Wislaw, on behalf of Defendant Marathon. Summary judgment was properly granted here because the plaintiffs haven't shown the specific and substantial evidence of pretext that's necessary to raise a dispute of material fact. And I want to go first to the issue that seems to have dominated the first portion of this, as to whether or not people were fired and whether or not there's been some kind of misrepresentation by Marathon about what happened with various people's employment. And this is all set out very, very clearly in the excerpts of record at pages B-11 and B-12, which is the affidavit of Van Winkle. The reality, as I think the court has hit on, is that some people were moved around, but when you turned on that radio station, KORD, that these plaintiffs worked for, the voices that were coming out of that radio on every shift within two months of Marathon having taken over were completely different than the voices that were coming out of that radio prior to the purchase by Marathon. So there was a complete change of what this radio seemed to be like. Everybody on it was different. And then also, if you look at the testimony of Paul Drake, who was the program director, the person who actually decides the content, what this radio station is going to look and feel like, he also testified that every aspect of it was changed, that they contracted with a computerized music service that provided different music than it had been before. The brand is the terminology that they used. They changed the format. They went back to a 12-in-a-row format. They did a big kickoff where they played George Strait music for an entire weekend. And they were trying to kind of turn it around. And indeed, the record bears out the fact that they were really trying to make this their own station. They got an entirely new morning show. And a few months later, they concluded that morning show wasn't working either, and they completely replaced those people again. There were clearly big changes going on. And I don't think there's ever been a misrepresentation about any of these individuals being fired. Some of them were moved around to other stations. But everyone was replaced as to KORD, and that's the station that these plants worked for. How do you answer Ms. Allen's argument that others are replaced in a softer way, they're given a different job, they're not fired, and Stiegel and Croom are fired? I mean, certainly everybody's employment situation was different. But I would say, for example, Ms. Stiegel's co-host, Ed Daly, he worked there six days a week at the time that Marathon took over. He did the morning show and he did a Sunday three- or four-hour oldie show. Thirty days after Plaintiff Stiegel was let go, he was relieved of his duties entirely except for four hours a week. Same with her other co-host, Pat Harvey. He was ‑‑ I think that what this bears out is that he was ‑‑ Pat Harvey, who also goes by the name Hootie, was removed from the KORD morning show on a daily basis. He continued to do part-time voice tracking for another radio station in the cluster at an hourly rate of $7.50, but he was only working ten hours a week. Eventually, after they got on to this third morning show, he was brought back. And the ‑‑ I think the most pertinent question is, is there evidence in this record that KORD wasn't making changes and that these people weren't part of those changes? And there isn't evidence like that. I mean, it's clear that this whole station was really being jumbled around as they tried to kind of get their grounding. And there's no evidence that comes out of this to suggest that this was all a sham designed to get rid of them or anything of the sort. Is there any evidence in the record about, which there may or may not be, but about the frequency with which acquiring, you know, radio ‑‑ acquirers of radio stations do broad changes, or whether that's common or whether that's unusual? There's no ‑‑ there's no evidence in the record. The only evidence that really speaks to that at all is, I believe, in the affidavit of Eric Van Winkle, in which he states that when a new owner is coming in, they typically do hire whoever's there because you can't have dead air. Dead air will eliminate your radio station from, you know, people's preset buttons. And so they keep whoever's on and then they make the changes. And that's typically the point. No evidence about frequency with which there's a broad change. No. Over, let's say, 30 or 60 days. No. There's no evidence about that. And there is evidence that this, that Marathon took over five radio stations in the cluster, and that the changes that it made were primarily to KORD, the country music station, because that was viewed as the financial anchor of that cluster. And also there's testimony from, I think, primarily Paul Drake and Eric Van Winkle, that there was a competing country station that had started up across the street and that they felt that they were substantially losing their market share to this competing station. So there was a sense that we've got to do something to get back our market share. There was a particular need as to the country music station. Didn't the evidence in this case really show, without going into any specifics at all, but an overall public policy, an overall policy of the company, that they were favoring men over women? Couldn't a jury legitimately find that to be true? Your Honor, I don't believe that a jury could find that to be true at all. And certainly not towards favoritism. I mean, if you look at, for example, Linda Stiegel and The Morning Show, that was populated by two men and a woman. They were the people on that show. They let go both the men and the woman. No, Your Honor, I don't see how that's true at all. And they replaced That Morning Show with a male-female team. This is summary judgment. That's correct, Your Honor. Why should they be deprived of their right to require the corporation, their former employer, to face that jury and say we didn't discriminate against women? They had a lot of pervasive overall feelings that there was. This is an employment case, and employment cases are necessarily really fact-intensive. There's just tons of facts because you're dealing with people's day-to-day lives, which consists of a lot of minutia and a lot of details. And the courts have set up, I think, a pretty coherent system of ensuring that there's a specific quantum of evidence there showing that really there is some possibility of discrimination before you inconvenience, you know, a panel of people to come in and hear the details of other people's lives. And let me run through real quickly what I think that format is and why it's not met here. The cloud judge says there was discrimination. I don't believe that's correct. Didn't he find that there was a basis? At first, the plaintiff had established a prima facie case that there was discrimination. But that only goes far. But they failed the non-discriminatory reasons for its firing. Understood, Your Honor. But that's only partway through the burden-shifting process. To state a prima facie case in its retaliation here being argued, not discrimination, the plaintiff has to show protected activity, adverse action, and causation. And once the prima facie case is shown, then the employer gets to come forward with legitimate, non-retaliatory reasons for its termination decision. Here, the reason was we were changing this radio station. And plaintiff has never argued that the employer failed to meet its burden of setting forth these non-retaliatory reasons. At that point, any inference of retaliation that arises from the prima facie case, according to the Yartsoff decision, which I think is quoting Verdeen, drops away altogether. So then you're back to square one. And there is no presumptive evidence of retaliation out there. At that point, the question then becomes, has either of these plaintiffs shown that Marathon's explanation, we were making changes and we saw nothing fabulous about you that would warrant an exception from that plan of change, is the plaintiff has to show that that is unworthy of belief or that retaliation more likely motivated the decision. And the shorthand for that is that they have to show pretext? They have to show pretext. In other words, that the idea that the station's making broad changes was a motive for this, they have to show that's pretextual. It's not worthy of belief. Right. It's a phony reason. Correct. You have to show either that it's a sham. And then I think it's actually very helpful that the Ninth Circuit has made a distinction between direct evidence and circumstantial evidence at this stage. And the Godwin v. Hunt-Wesson case is the most articulate on this point. And although the Ninth Circuit has recognized that there can be hybrid situations where you have both circumstantial and direct evidence, this is not one of those situations. This case involves solely circumstantial evidence. And under Godwin, to prove pretext, to prove that the employer's explanation is artificial, you have to show evidence that is both specific and substantial. So at this stage in the proceeding, the plaintiff has the burden of coming forward with evidence that's specific and substantial, demonstrating that Mary Fon's explanation, it was making changes to KORG radio station, is not worthy of being believed. And that evidence simply is not here. The Court's decisions have made clear that minor factual discrepancies are not sufficient to avoid summary judgment. And, for example, in the Godwin case, the Court did find that there was evidence of pretext, and that was a case where a woman claimed that her employer had failed to promote her and had hired, had discriminatorily hired a man instead of her. And the Court found evidence of possible pretext because the evidence in the record of the contemporaneous reasons for the selection of the male applicant for this position a woman had applied for was inconsistent in material ways with the statements upon which the employer relied. And, for example, the employer said that the most critical criteria for the person that it was hiring for the job in that case was the male applicant's creativity, but in its memo about why it had hired this guy, it hadn't mentioned creativity. And there was evidence in the similar memo about why it hadn't hired the plaintiff, that she was very creative. So, I mean, things are going completely in opposite directions from what the employer was saying. And, most importantly, there was evidence in Godwin that the employer actually was looking for, but then it gave the job to someone else despite her having those traits it was looking for. That's really different from this case and from the discrepancies that the plaintiff is claiming exist here. Here the plaintiffs are saying essentially we're really valuable and Marathon should have viewed us as more valuable than it did. They aren't saying Marathon really viewed us as these valuable commodities, but then it did this inexplicable thing as a result. The closest that plaintiffs come to this are with Plaintiff Stegall saying that she got these reassurances of job security. But there's a couple of facts here that are very significant about this. First of all, she sought those out. She says she stuck her head in the office of both Van Winkle and Paul Drake when Marathon took over and they were Marathon management and said, is my job secure? And Paul Drake has submitted this affidavit that says you always say someone's job is secure because they have this mouthpiece to the population and you don't want a disgruntled employee on the air. It's also significant that in the affidavit of Ed Daly, a male employee who had never complained about discrimination, he indicates at page C46 of the record that he received an equivalent message. He says in his statement, you always ask in radio because you never know how long you're going to work anywhere. And he indicates that he was told he was just doing a great job in the morning and that the Sunday morning show had great comments. He sensed the Sunday morning show was more secure because they made the great comments comment. But it's clear that when the evidence is viewed as a whole, that they weren't in some way singled out, told they were doing a fabulous job in connection to other people. Marathon's just continuing the status quo until it makes the changes. With regard to the, you know, let's take the total number of people who had daily announcing jobs, who lost them within, let's say, 30 to 60 days of the takeover. How many of those were women and how many are men? Does the record tell us that? I think that the names make clear. And I would just recommend that the court look at the bottom of page B11 and the top of B12. And, for example, they took out their overnight announcer, Gary Mitchell, and they filled that shift with prerecorded music. So they removed a man, but they didn't really put a human being in. Pete Stegall's co-announcer was a man. He lost the daily thing and just was left with four hours a week on Sunday. And Pat Harvey Hootie is a male, even though the name Pat is somewhat ambivalent. So. Let me ask this because you've only got about you've got about five minutes left here. How do you deal with or answer Ms. Allen's argument that, OK, let's let's put this wholesale change of announcers to the side? Marathon also gave a number of other reasons why Ms. Kroom or Ms. Stegall were unsatisfactory, and she advances evidence to contradict those reasons. Well, they're all kind of subjective things. And in every employment case, when someone says, I didn't like your attitude, I didn't like your work, the plaintiff inevitably says, I do good work, I have a great attitude. And I think that by setting up this burden shifting mechanism, rather than just looking at, are there some details where people have a dispute, the court has set up a framework for ensuring that little discrepancies are not considered to be material. The reality is, on this record, there is no shortage of evidence showing that Marathon's management team were not fans of these plaintiffs prior to any complaint. For example, with Ms. Kroom, the record's undisputed that both Paul Drake, who took over as the program director for CORD, and Kurt Cartier had over a year before I think a sale was even in the picture, both removed voice tracking duties from her because they thought she had poor work quality and did sloppy work. Voice tracking is where you record a radio show in advance, and then it's all computerized to just play like a line of someone saying, the next song is this, and then they play the song, and it's all computerized. And they thought she did sloppy work and she didn't update her voice tracks. So when they were working at other stations and she was doing work for them there, she had done bad work. That's undisputed. Also, Marathon expressed generally, from beginning to end of this, concerns that Ms. Kroom had poor relationships with her coworkers. And it's clear that even though she says, well, no, I got along with my coworkers, these weren't fabricated. If you look in the record at C-26, there's this really hot letter from Ms. Kroom, very angry, using vulgarity to a coworker who showed up late for the shift after hers, causing her to have to work late, where she curses and says she's going to eat him for breakfast and that sort of thing. I'm sure that plaintiff's counsel will say, well, they didn't point specifically to that during the litigation of this matter as being a reason why they viewed her as having poor relationships with coworkers. But Ms. Kroom admits to writing that letter. And the reality is this is not baseless stuff. There's clearly a sound basis for a generalized perception among Marathon's management team that there was friction between Ms. Kroom and her coworkers. And I think the briefing is fairly complete on this, that there's kind of little places at the margins where it's possible to get really excited about some difference in the facts as viewed by Marathon and the facts as viewed by plaintiff. But the court is required to follow the burden-shifting mechanism. So it isn't the only issue, really, that's framed for us, whether under the McDonnell-Douglas test on this last, the third issue, whether there's a genuine issue of fact about whether Marathon's terminations, as purportedly as part of a wholesale program of change, is pretextual. I think that is correct, with the caveat being that because this case involves circumstantial evidence, that any evidence that plaintiffs put forward has to be specific and substantial. Specific and substantial evidence of pretext. That's the issue. That's correct, Your Honor. This is a summary judgment case, and we have a situation in which it's conceded almost that the woman was treated badly because she was a woman. Sex discrimination. She made out a prima facie case. Well, this isn't a discrimination case. Isn't that true, she made out a prima facie case? No, she made out a prima facie case of retaliation. This isn't a discrimination case. I'm going to get to the retaliation later. But didn't the evidence show that there were material issues of fact concerning discrimination? No. That only goes partway into because she made out a prima facie case of retaliation, and then Marathon came forward with its legitimate non-discrimination, non-retaliatory reasons for its decision. At that point, under the Yartsov case and under the U.S. Supreme Court case of Berdeen, any inference of retaliation drops away. And at that point, the burden of production on pretext merges with her initial burden of production. That's the rule on summary judgment? Yes, Your Honor. Or trial? On summary judgment. Okay. Thank you, Your Honor. Okay.  Your time is up. We appreciated your argument. Ms. Allen, you have a few minutes left. Thank you, Your Honor. Your Honor, I would like to emphasize that I respectfully disagree that the issue here is limited to whether the wholesale changes constituted a pretext. I think when an employer gives a number of reasons for terminating an employee, you have to look at all of those reasons to see if they're true. This employer came in and said at first, these people, these two women didn't do anything wrong. There was no reason, no cause on their part for their dismissal. Then when the litigation started, and in the Godwin case, the court was very clear, you've got to be suspicious of reasons that come up after the litigation started. And these are not minor factual discrepancies, as counsel would suggest, where there's just a glimmer of hope that there might be a dispute. In fact, there was no statement that Kristen Kroom just didn't get along with people. These were very specific incidents, and they're detailed in the brief. For example, Eric Van Winkle said she came in and complained to him five times, and he didn't like that about her. She didn't go in there five times. I mean, if there's evidence she didn't go in there, and he says she did, and that's the reason he fired her, a jury should be able to resolve whether the employer is telling the truth. There is a whole list of reasons of events that went on like that that the employer came up with in their depositions, and I don't think those can be sidelined as some minor factual discrepancies. Those were the heart of the reasons they gave, and if they're not true or there's evidence they're not true, it's really for the jury to weigh that. And I'd ask the Court to take that into account and reverse the summary judgment and allow this case to go to trial. Thank you. Thank you very much for your argument. Thank you. Very nicely presented by both sides, and we appreciate it. The case will be submitted.
judges: Lay (8th Cir.), Ferguson, Gould